# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| **Plaintiff,** | |
| **v.** | **Case No. 1:10cr47** |
| **JEFFREY G. GORDER,** | |
| **Defendant.** | **Magistrate Judge Paul M. Warner** |

Before the court are the following motions: (1) Defendant Jeffrey G. Gorder's ("Gorder") motion to suppress the breath test result;[1] (2) Gorder's motion to suppress evidence for lack of probable cause;[2] and (3) the United States of America's ("Government") "Motion to Pre-Admit Certification of Breathalyzer Calibration, State of Utah Intoxylyzer [sic] 8000 Operation Checklist and Result for . . . Gorder[,] and Law Enforcement Officer Intoxilyzer Operator Certificate."[3] The court held an evidentiary hearing on the motions to suppress on April 20, 2010. At the hearing, Gorder appeared and was represented by Glen W. Neeley, and the Government was represented by Andrew D. Richey. The Government requested, and was granted, additional time to submit certified records of the Intoxilyzer 8000 Operation Checklist

---

[1] *See* docket no. 5.

[2] *See* docket no. 4.

[3] Docket no. 10.

and Breath Alcohol Concentration Report.  The Government filed those documents along with its

motion to "Pre-Admit" on April 30, 2010.[4]  On May 4, 2010, Gorder filed an opposition to the

Government's motion,[5] along with his opening briefs in support of his motions to suppress.[6]  The

Government filed its opposition brief on May 19, 2010,[7] and Gorder filed his reply brief on May

20, 2010.[8]  After thorough review and consideration of the motions, the testimony presented at

the evidentiary hearing, and the briefs submitted by the parties, the court renders the following

Findings of Fact, Conclusions of Law, and Order.

## I.  FINDINGS OF FACT

### A.  Testimony of Senior Airman Ryan Thomas

Senior Airman Ryan Thomas ("Thomas") is a police officer at Hill Air Force Base

("HAFB") in Utah.[9]  On February 7, 2010, Thomas was on patrol and noticed a vehicle that

failed to signal while making a left turn at the intersection of Sixth and E Street.[10]  Thomas

---

[4] Docket no. 10.

[5] *See* docket no. 11.

[6] *See* docket nos. 12 and 13.

[7] *See* docket no. 14.

[8] *See* docket no. 15.

[9] Official Transcript of April 20, 2010 Evidentiary Hearing on Motions to Suppress
(hereafter referred to as "Tr. at ___") at 6.

[10] *See* Tr. at 7.

initiated a traffic stop of the vehicle.[11]  Upon making contact with the driver, Gorder, Thomas

"noticed an alcoholic beverage odor" and asked Gorder if he had been drinking.[12]  Gorder

responded that he had not.[13]  Thomas also noticed that Gorder had "bloodshot eyes and slurred

speech" and that he was "nervous" and "shaky."[14]  Thomas further observed a "heavily

intoxicated" passenger in the vehicle.[15]

Thomas asked Gorder to step out of the vehicle and submit to field sobriety tests.[16]

Gorder complied.[17]  Thomas and another officer, Staff Sergeant Porter ("Porter"), conducted

three field sobriety tests on Gorder pursuant to the National Highway Traffic Safety

Administration standards ("NHTSA Standards"): the Horizontal Gaze Nystagmus ("HGN"), the

One-Leg Stand, and the Walk and Turn.[18]  Thomas indicated that he was trained on the One-Leg

---

[11] *See id.*

[12] *Id.*

[13] *See id.*

[14] *Id.*

[15] *Id.* at 28.

[16] *See id.* at 7.

[17] *See id.* at 8.

[18] *See id.* at 11-12; *see also* docket no. 13, Attachment 2, NHTSA Standards at VIII-1 to VIII-19.

Stand and the Walk and Turn tests under the NHTSA Standards, but that he was not trained on the HGN test.[19]  Porter was apparently trained to conduct the HGN test.[20]

Thomas conducted the One-Leg Stand test first and testified that Gorder "presented all the clues."[21]  The four standardized clues are the suspect (1) "sways while balancing," (2) "[u]ses arms for balance," (3) "hop[s]," and (4) "[p]uts foot down."[22]  Thomas could not say at what count Gorder put his foot down, how many times Gorder put his foot down, how high Gorder raised his arms, or what point Gorder hopped.[23]  Thomas did, however, testify that Gorder began the test before being instructed to do so.[24]  The NHTSA Standards provide that "if an individual shows two or more clues or fails to complete the One-Leg Stand, there is a good chance the [Blood Alcohol Content] is above 0.10."[25]

---

[19] *See* Tr. at 31.

[20] Although neither the Government nor Gorder's counsel established that Porter was trained to conduct the HGN test, the court will presume that he was.

[21] Tr. at 9.

[22] NHTSA Standards at VIII-13.

[23] *See* Tr. at 34.

[24] *See id.* at 32.

[25] NHTSA Standards at VIII-13.

Thomas then conducted the Walk and Turn test on Gorder.[26]  Thomas testified that Gorder followed his directions correctly and did not start this test early.[27]  However, Thomas could not explain why his DUI Report and his Alcohol Incident Report both indicated that Gorder did start early on the Walk and Turn test.[28]  Thomas also stated that Gorder exhibited the following clues on the Walk and Turn test: he raised his arms, he stepped of the line, and he took more than nine steps.[29]  Thomas further indicated that Gorder "almost fell over in the middle of the street when he was completing his pivot."[30]  Under the NHTSA Standards, "if the suspect exhibits two or more clues on this test or fails to complete it, classify the suspect's [Blood Alcohol Content] as above 0.10."[31]

Thomas then had Porter conduct the HGN test on Gorder.[32]  For the HGN test, the NHTSA Standards instruct officers to look for the following clues in each eye: (1) "The Lack of Smooth Pursuit," (2) "Distinct and Sustained Nystagmus At Maximum Deviation," and (3) "Onset of Nystagmus Prior To 45 Degrees."[33]  Thomas testified that he observed Porter conduct

---

[26] *See* Tr. at 10.

[27] *See id.*

[28] *See id.* at 35.

[29] *See id.* at 35-36.

[30] *Id.* at 36.

[31] NHTSA Standards at VIII-11.

[32] *See* Tr. at 11.

[33] NHTSA Standards at VIII-5.

the HGN test on Gorder.[34]   Thomas stated that Gorder's "eyes did not pursue smoothly" and "he

had nystagmus at maximum deviation."[35]   Thomas, however, admitted that the DUI Report and

Alcohol Incident Report were not consistent.[36]   At the hearing, the following exchange took place

regarding Thomas's discrepancies in the various reports:

> A.    He had – I don't remember what I wrote on paper, but I'm pretty sure he
> had nystagmus at maximum deviation, because that's – when not
> performing the test, to me that's the actual easiest sign to see."
>
> Q.    And then you wrote in your [DUI] report: "Both eyes did not pursue
> smoothly and did not have distinct nystagmus at maximum deviation."
> You wrote that he didn't have distrinct nystagmus at maximum deviation?
>
> A.    I think I just worded it wrong, but I know for sure he did, because like I
> say, that's the actual easiest one to tell.  When his eyes are at maximum,
> you see them pinging off the sides of his eyes.
>
> Q.    Then you wrote a narrative in this case, right?  And you wrote: "Did not
> pursue smoothly and did not have nystagmus onset prior to 45 degrees."
>
> A.    Right.
>
> Q.    And then you did an alcohol incident report.  You checked boxes.  "Eyes
> did not pursue smoothly," you marked "no."  "Distinct nystagmus on
> maximum deviation," you marked "no"?
>
> A.    Right.
>
> Q.    And then "nystagmus onset prior to 45 degrees," you marked "yes"?
>
> A.    Right.  I think, yeah, I think when I was looking at – when I was looking at
> it I got the nystagmus part backward.
>
> Q.    So you have three different reports with three different answers of what
> you saw that night, right?
>
> A.    Correct.[37]

---

[34] *See* Tr. at 12.

[35] *Id.* at 12.

[36] *See id.* at 40.

[37] *Id.* at 40-41.

Based on the three field sobriety tests, Thomas determined that Gorder was possibly intoxicated and could not safely operate his vehicle.[38]  Thomas then detained Gorder, placed him in the patrol vehicle, and transported him to the police station.[39]

Thomas provided different times for when he began the Baker Rule on his DUI Report and Alcohol Incident Report.[40]  Thomas testified that he could not provide an exact time for the initiation of the Baker Rule but that it was either 1:55 or 2:06 a.m.[41]  Thomas testified that the Baker Rule requires that the suspect is watched for at least fifteen minutes to "make sure they don't have any gum in their mouth, any kind of tobacco, [to] make sure they don't burp, vomit, [or] anything of that nature" prior to the Intoxilyzer 8000 test.[42]  Thomas initially testified that upon beginning the Baker Rule, he personally checked to see that Gorder's mouth was empty.[43]  However, the following exchange took place at the hearing:

> Q.    The first question is: I thought you testified earlier you're the one that checked his mouth.  Is that true?
> A.    That is true.
> Q.    And the other question is –
> A.    No, actually it's not, no.  I don't – well, no.  Well . . .
>       THE COURT:  It would be either "yes," "no," or "I don't know."
> A.    I don't know.

---

[38] *See id.* at 12.

[39] *See id.*

[40] *See id.* at 23.

[41] *See id.* at 22.

[42] *Id.* at 13.

[43] *See id.* at 14.

| Q. | (By Mr. Neeley) So you remember all these clues looking over somebody's shoulder, and you don't remember if you looked in this man's mouth? |
|----|----|
| A. | I know I did check his mouth.  Well, yes, I looked at – I was actually – I, at one point – |
| Q. | Please don't guess. |
| A. | – looked in his mouth. |
| Q. | Just follow the judge's recommendation.  "Yes," "no," or "I don't know." |
| A. | Are you talking about the time when he was placed in handcuffs? |
| Q. | Yeah. |
| A. | At that point in time, I don't know if I was the one that actually looked in his mouth during that time during the overwatch. |
| Q. | Was there another time that you looked in his mouth?  I mean, that's what it sounds like you're saying, at that time, I don't know if I was. |
| A. | I don't know.  I can't – I couldn't answer right now.[44] |

Thomas indicated that while he personally did not observe Gorder for the entire Baker

Rule period, "[t]here's always somebody watching them at all times in the interview room."[45]

Because Thomas was not certified on the Intoxilyzer 8000, he called Sergeant Purdy ("Purdy"),

who was certified,[46] to give Gorder the breathalyzer test.[47]  Thomas testified that he observed

Purdy conduct the check of the Intoxilyzer 8000 and the breath test on Gorder.[48]  Thomas

indicated that Gorder stopped breathing in the middle of the first two tests[49] and that it "took a

---

[44] *Id.* at 70-71.

[45] *Id.* at 25.

[46] *See id.* at 15.

[47] *See id.* at 14.

[48] *See id.* at 16.

[49] *See id.*

good 20, 25 minutes" to get a full breath sample.[50]  Thomas stated that Gorder provided a sufficient breath sample on the third try and that his result was .166.[51]

Purdy was not available to testify at the evidentiary hearing because he had been deployed to Afghanistan.[52]

### B.  Testimony of Senior Airman Rose Sandeen

Senior Airman Rose Sandeen ("Sandeen") is a police officer at HAFB and was on duty with Thomas on February 7, 2010.[53]  Sandeen testified that she and Thomas performed a traffic stop on Gorder for failing to use his turn signal prior to making a turn.[54]  As Thomas approached the driver's side of the vehicle, Sandeen approached the passenger side of the vehicle.[55]  Sandeen testified that she smelled alcohol coming from the car when she was about two or three feet away from it.[56]

Sandeen testified that Gorder was stuttering, had slurred speech, and had bloodshot eyes.[57]  Because Sandeen had only been on the job for a week and was not yet a certified

---

[50] *Id.* at 45.

[51] *See id.* at 16, 19.

[52] *See id.* at 68.

[53] *See id.* 52-53.

[54] *See id.* at 53.

[55] *See id.*

[56] *See id.* at 53-54.

[57] *See id.* at 54.

patrolman at HAFB, she merely observed Thomas and Porter conduct the field sobriety tests upon Gorder.[58]  Sandeen testified that Gorder performed the tests "poorly."[59]  Sandeen stated that during the One-Leg Stand test, Gorder "tried to start early two times that [she could] recall, and then he was just having some pretty . . . bad balance problems.  And he kept – he tried to hold on to the car to keep his balance. . . . He put his foot down at least two times.  Numerous mistakes."[60]  Sandeen testified that during the Walk and Turn test, Gorder "tried to start early numerous times.  And he just – poor balance.  He almost fell over once, and he did the incorrect number of steps.  He couldn't do the heel-to-toe every single time.  Like I said, once again, just poor balance in general."[61]

Sandeen also stated that she checked Gorder's mouth when she and Thomas began the Baker Rule period and that it was empty.[62]  Sandeen and Thomas then transported Gorder back to the squadron, and Sandeen stated that she observed Gorder the entire time he was in the patrol vehicle.[63]  Sandeen stated that she escorted Gorder to the interview room.[64]  Sandeen also stated that while she did leave the interview room during the Baker Rule period, she instructed others to

---

[58] *See id.*

[59] *Id.* at 55.

[60] *Id.* at 56.

[61] *Id.* at 57.

[62] *See id.*

[63] *See id.*

[64] *See id.* at 65.

watch him while she was gone.[65]  Specifically, she stated that the duty to watch Gorder was split

up between herself, Thomas, Purdy, and their flight chief.[66]

Sandeen testified that it took about twenty to twenty-five minutes for the breathalyzer test

to be administered because Gorder was being uncooperative by not blowing enough air and by

putting his tongue on the tube to stop the airflow.[67]  Sandeen testified that Gorder finally

provided a sufficient breath sample to test and that his result was .166.[68]

## II.  CONCLUSIONS OF LAW

The Government moves this court to "Pre-Admit Certification of Breathalyzer

Calibration, State of Utah Intoxylyzer [sic] 8000 Operation Checklist and Result for . . .

Gorder[,] and Law Enforcement Officer Intoxilyzer Operator Certificate."[69]  Gorder moves this

court to suppress his breath test result[70] and to conclude that Thomas did not have probable cause

to arrest Gorder.[71]  Because the Government's motion to "Pre-Admit" the above-mentioned

documents and Gorder's motion to suppress the breath test result pertain to the same subject

matter, the court will address them together.

---

[65] *See id.* at 65-66.

[66] *See id.* at 65.

[67] *See* Tr. at 59.

[68] *See id.* at 60.

[69] Docket no. 10.

[70] *See* docket no. 5.

[71] *See* docket no. 4.

### A. Motions Regarding Breath Test Result

Gorder asks this court to suppress his breath test result on the grounds that the Baker Rule procedures were not followed. The Government seeks to admit into evidence the Certification Report for the Intoxilyzer 8000, the Intoxilyzer 8000 Operational Checklist, Gorder's breath test results, and Purdy's Intoxilyzer Operator Certificate.

Under Utah law, the Baker Rule requires that

> [t]o ensure that the results of an intoxilyzer test are reliable, the [Government] must present evidence, inter alia, that: (1) the intoxilyzer machine had been properly checked by a trained technician, and that the machine was in proper working condition at the time of the test; (2) the test was administered correctly by a qualified operator; and (3) a police officer observed the defendant during the fifteen minutes immediately preceding the test to ensure that the defendant introduced nothing into his or her mouth during that time.

*State v. Vialpando*, 89 P.3d 209, 213 (Utah 2004) (citing *State v. Baker*, 355 P.2d 806, 809-10 (Wash. 1960) (articulating the foundation elements for intoxilyzer tests)).

Applying the Baker Rule to the instant case, the court concludes that the Government failed to lay a proper foundation for the introduction of the breath test results and Intoxilyzer 8000 Operational Checklist. Because Thomas was not certified on the Intoxilyzer 8000, Purdy performed the breathalyzer test on Gorder.[72] While the Government did provide evidence that Purdy was certified on the Intoxilyzer 8000, he had been deployed to Afghanistan and was unavailable to testify at the evidentiary hearing.[73] To properly admit both the breath test result and the Intoxilyzer 8000 Operational Checklist, both of which are testimonial statements, the

---

[72] *See id.* at 14.

[73] *See id.* at 68.

Government must have provided Gorder an opportunity to cross-examine Purdy. *See Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2532 (2009) (holding that the admission of a chemist's certificates of analysis that attested that material seized by the police and linked to the defendant contained cocaine violated the Confrontation Clause of the Sixth Amendment when the chemist did not testify). The Government failed to provide Gorder that opportunity. Furthermore, under *Melendez-Diaz*, Thomas may not be substituted as a witness for Purdy. *See id.* at 2532. As this court stated in *United States v. Ruzicka*, No. R3249152, (D. Utah Nov. 25, 2009), and reiterates here,

> [t]he court is acutely aware of military exigencies that may require military personnel to deploy and thereby become unavailable to testify, as was [Purdy]. However, in this case, [Purdy] became a key witness, and the Government's [breath test admission] could not be sustained without his testimony. The court notes that no continuance request was received by the court nor made by the Government. Likewise, notwithstanding the unique aspects of military service, a defendant's constitutional right to confront the witnesses against him cannot be compromised. Military authorities must realize that by deploying security forces, while cases are pending, may well result in the cases being compromised.

*Id.* at 10 n.58.

In addition, rule R714-500-6(D) of the Utah Administrative Code provides that "[o]nce an instrument has been placed into service at a specific location, it shall be certified by a technician on a routine basis, not to exceed 40 days between certification checks." Utah Admin. Code R714-500-6(D). The documents the Government seeks to admit indicate that the last check of the HAFB Intoxilyzer 8000 occurred on November 2, 2009.[74] According to the rule, a check of the Intoxilyzer should have been conducted no later than December 12, 2009, and then again

---

[74] *See* docket no. 10 at Exhibit 2.

on January 21, 2010. *See id.* Thus, because ninety-seven days elapsed between the last check of the HAFB Intoxilyzer 8000 and Gorder's test, the Government has failed to demonstrate that the machine was in proper working order at the time of Gorder's test. *See Vialpando*, 89 P.3d at 213.

Furthermore, allowing an expert to testify under Federal Rule of Evidence 703 as to the "raw data generated by the Intoxilyzer machine" as requested by the Government would be futile.[75] Specifically, while rule R714-500-9(D) provides that "[o]nly certified breath alcohol testing technicians shall be authorized to provide expert testimony concerning the certification and all other aspects of the breath testing instrument under their supervision," the Intoxilyzer 8000 had not been checked for ninety-seven days prior to Gorder's breath test, and, therefore, any results from that machine would be unreliable and inadmissible. *See Vialpando*, 89 P.3d at 213.

Based on the testimony of both Sandeen and Thomas, it appears that Gorder was observed for at least fifteen minutes before the breath sample was obtained. Specifically, both officers testified that it took twenty to twenty-five minutes to obtain a breath sample from Gorder. However, because the Government failed to demonstrate that the first two elements of the Baker Rule were followed, it is of no moment to the court whether an officer observed Gorder during the fifteen minutes immediately preceding the breath test. Based on the foregoing, the court concludes that the Baker Rule was not followed in this case. Accordingly, Gorder's motion to suppress the breath test results is **GRANTED**, and the Government's motion to "Pre-Admit" is **DENIED**.

---

[75] Docket no. 10 at 4.

### B.  Motion to Suppress Based on Lack of Probable Cause

Gorder asserts that Thomas did not possess probable cause sufficient to arrest him.  The court does not agree.  To justify a warrantless arrest under the Fourth Amendment to the United States Constitution, an officer must have "probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). "Probable cause arises when there exist 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Villagrana-Flores*, 467 F.3d 1269, 1273-74 (10th Cir. 2006) (quoting *DeFillippo,* 443 U.S. at 37).  "Probable cause does not require facts sufficient for a finding of guilt; however, it does require more than mere suspicion." *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001) (quotations and citations omitted).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).  "Probable cause is measured against an objective standard." *Id.*  "[T]he primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *Id.* at 896-97 (quotations and citations omitted).

The court concludes that a reasonable officer in Thomas's position would have believed that probable cause existed to arrest Gorder for driving "under the influence of alcohol . . . to a degree that render[ed him] incapable of safely operating a vehicle."  Utah Code § 41-6a-502(1)(b).  Both Thomas and Sandeen testified that Gorder performed poorly on the field

sobriety tests. Specifically, both officers testified that (1) Gorder failed to signal when making a left turn, (2) an alcoholic beverage odor emanated from the vehicle and from Gorder's person, (3) Gorder had bloodshot eyes, (4) Gorder's speech was slurred, (5) Gorder was nervous and shaky, (6) Gorder began the One-Leg Stand test early, (7) Gorder held onto the vehicle to keep his balance, (8) Gorder made numerous mistakes on the One-Leg Stand test, (9) Gorder almost fell over during the Walk and Turn test, and (10) Gorder had general balance problems.

Furthermore, Thomas also testified that Gorder failed the HGN test. While Thomas provided conflicting responses regarding his DUI Report and Alcohol Incident Report, the court finds his explanation for the conflicting reports to be plausible. In addition, Sandeen's testimony that she observed Gorder fail the One-Leg Stand and Walk and Turn tests further supports Thomas's decision to arrest Gorder for suspicion of driving under the influence of alcohol. While the court makes no finding at this time as to whether or not the field sobriety tests were conducted precisely in accordance with the NHTSA Standards, Gorder's poor performance would have provided a "reasonable officer" a basis for believing "that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *Valenzuela*, 365 F.3d at 896-97 (quotations and citations omitted).

Based on the foregoing, the court has determined that Thomas possessed probable cause sufficient to arrest Gorder. As such, Gorder's motion to suppress for lack of probable cause is **DENIED**.

### III.  CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Gorder's motion to suppress the breath test result is **GRANTED**, the Government's motion to "Pre-Admit" is **DENIED**, and Gorder's motion to suppress for lack of probable cause is **DENIED**.

**IT IS SO ORDERED.**

DATED this 21st day of June, 2010.

BY THE COURT:

_____
PAUL M. WARNER
United States Magistrate Judge